## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW CINGULAR WIRELESS PCS, LLC d/b/a AT&T Mobility,<br><br>             Plaintiff,<br><br>    v.<br><br>THE PLANNING BOARD OF THE TOWN OF CORINTH, THE TOWN OF CORINTH, and THE TOWN OF CORINTH BUILDING DEPARTMENT,<br><br>             Defendants. | Civil Action No.<br>1:21-CV-149 (BKS/ATB)<br><br>**COMPLAINT** |

Plaintiff New Cingular Wireless PCS, LLC, by way of Complaint against the Planning Board of the Town of Corinth, the Town of Corinth, and the Town of Corinth Building Department (collectively, "Defendants"), hereby says:

### PARTIES

1. Plaintiff New Cingular Wireless PCS, LLC ("AT&T") is a Delaware Limited Liability Company with its principal place of business at 1025 Lenox Park Boulevard NE, Atlanta, Georgia 30319.

2. Upon information and belief, defendant Planning Board of the Town of Corinth (the "Planning Board") is a local government entity or instrumentality thereof duly constituted and established pursuant to New York law and having an office at 600 Palmer Avenue, Corinth, New York 12822.

3. Upon information and belief, defendant Town of Corinth (the "Town") is a local government entity or instrumentality thereof duly constituted and established pursuant to New York law and having an office at 600 Palmer Avenue, Corinth New York 12822.

4. Upon information and belief, defendant Town of Corinth Building Department (the "Building Department") is a local government entity or instrumentality thereof duly constituted and established pursuant to New York law and having an office at 600 Palmer Avenue, Corinth, New York 12822.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as AT&T is asserting a claim arising under federal law, more particularly, 47 U.S.C. § 332(c)(7), enacted as part of the Telecommunications Act of 1996 (the "TCA").

6. This Court has supplemental jurisdiction over all other claims herein, pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy and are related to AT&T's claims under the TCA.

7. Venue is proper in this District under 28 U.S.C. § 1391(b), as the Defendants reside or may be found in this District, the property that is the subject of this action is located in this District, and the acts or omissions giving rise to this action occurred in this District.

8. Expedited review of this action is required pursuant to 47 U.S.C. § 332(c)(7)(B)(v).

## **FACTUAL BACKGROUND**

<u>The Need for Reliable Access to AT&T's Services</u>

9. AT&T is a provider of personal wireless services ("services") pursuant to licenses issued by the Federal Communications Commission (the "FCC").

10. AT&T provides services through an interlocking network of line-of-sight transceiver facilities that permit the efficient reuse of frequencies allocated to AT&T by the FCC.

11. The radio signals used by AT&T to provide services are subject to disruption caused by topography, foliage, and man-made structures, as well as to range limitations inherent in the use of low-powered signals that permit frequency reuse.

12. Reliable access to AT&T's services from within structures by means of wireless devices ("in-building service") is crucial, as over half of all households nationally no longer utilize landline telephone service. Additionally, the work from home and remote schooling initiatives used to control the spread of COVID-19 during the pandemic State of Emergency rely heavily on reliable in-building access to telecommunications.

13. Reliable in-building access is also crucial to 911 and Enhanced 911 (E911) services, as 70% of 911 calls are not made from landline service.

14. Further accentuating the public safety significance of reliable access to AT&T's services, a portion of the frequencies licensed to AT&T are used to support FirstNet, a national public safety broadband network for first responders pursuant

to a statutorily- and congressionally-mandated public-private partnership between AT&T and the First Responder Network Authority.

16. There is currently an area roughly two miles in diameter and centered near the intersection of Sycamore Lane and First Street in the Town in which AT&T customers do not have access to reliable in-building service (the "service gap"). The service gap includes a commercial corridor centered on the intersection of Rt. 9N and Main Street in the adjoining Village of Corinth ("Village"), and in residential areas flanking Main Street in the Village and Town.

16. The service gap is significant in terms of size, number of persons affected, and degree of service deficiencies, as throughout the service gap, AT&T customers lack reliable in-building access to AT&T's services, and in many areas of the service gap these customers lack reliable access to services even while outdoors.

17. The Town of Corinth Land Use Law does not permit personal wireless services facilities by right or by special use permit, thus necessitating approval of a use variance to construct and operate such facilities in the Town.

18. To remedy the service gap, AT&T submitted an application for a use variance to the Town Zoning Board of Appeals ("Zoning Board") on March 5, 2020, and for site plan approval to the Planning Board on March 9, 2020, to locate a personal wireless services facility consisting of a 154-foot tall monopole and an enclosed equipment compound on the Howenstein property at 0 Sycamore Lane, Corinth, New York (the "proposed facility").

19. The Howenstein property is uniquely suited as a location for a facility to remedy the service gap for a number of reasons. First, it is centrally located and an area of relatively high elevation, minimizing the height of the structure needed to remedy the service gap.

20. The Howenstein property is also located relatively close to Main Street, permitting the provision of reliable in-building service to residential neighborhoods on either side of Main Street and to the commercial area to the north.

21. The Howenstein property is also heavily wooded with a grove of mature trees, and is bound by similar foliage to the east and south, providing significant natural buffering of the visibility of the proposed facility.

22. Neither the Zoning Board nor the Planning Board took advantage of the opportunity provided by 47 CFR § 1.6003(d) to toll the "Shot Clock" requiring a decision on the application in a reasonable time period, presumptively, 150 days, to request additional information they believed would be necessary to evaluate the proposed facility.

23. On March 5, 2020, the Zoning Board held a hearing at which it did not vote on the use variance application, but instead determined that the proposed facility required site plan approval from the Planning Board and deferred to the Planning Board to act as the lead agency to conduct a coordinated environmental review of the project required by the New York State Environmental Quality Review Act ("SEQRA").

24. On June 18, 2020, the Planning Board held a hearing at which it undertook a thorough environmental review of the construction and operation of the proposed facility and determined that the proposed facility would not result in any significant adverse environmental effect (including with respect to impacts on the character of the community) necessitating the issuance of a SEQRA negative declaration. Rather than address the application for site plan approval, however, the Planning Board referred the matter back to the Zoning Board for that Board's consideration of the application for a use variance.

25. On August 5, 2020, the Zoning Board held a public hearing on the use variance application, but declined to reach a decision on that application at the meeting.

26. On September 3, 2020, the Zoning Board held another public hearing on the use variance application. Although some Board members were ready to vote on that application, the Zoning Board, for the first time, expressed a desire for an independent expert review of the proposed facility, and asked AT&T to bear the cost of that review. At that time, the "Shot Clock" requiring action within 150 days of filing of the use variance and site plan applications was due to expire, but AT&T agreed to an extension to permit the requested independent review.

27. On October 1, 2020, the Zoning Board held yet another meeting without deciding the use variance application. The meeting, instead, was limited to approving the retention of Professor William Johnson as the independent expert.

28. On November 3, 2020, Professor Johnson issued a written report confirming the need for the proposed facility.

29. Professor Johnson's report also recommended that the Zoning Board request certain additional information that might be pertinent to review of the application, including photo-simulations of the proposed facility, a series of propagation plots of service from the proposed facility at varying heights to confirm that the full height of the proposed facility was needed, and an evaluation of potential alternate sites.

30. On December 1, 2020, AT&T provided supplemental materials providing the additional information discussed in Professor Johnson's report.

31. AT&T's December 1, 2020 submission contained a series of propagation plots of the existing facility at different heights establishing that the full height of the proposed facility is needed to remedy the service gap.

32. AT&T's December 1, 2020 submission also contained photo-simulations of the proposed facility showing that even from the closest vantage points, the surrounding mature trees provided a significant visual buffer by obscuring a substantial portion of the proposed facility from view.

33. AT&T's December 1, 2020 submission also contained an evaluation, including propagation plots, of three alternate sites.

34. AT&T's December 1, 2020 submission noted that there are no existing towers or tall structures within or in close proximity to the search ring, which consists

almost entirely of residential and retail commercial uses, which would allow for collocation of AT&T's antennas to address the demonstrated gap in service.

35. AT&T's December 1, 2020 submission demonstrated that a facility at the KW Equestrian Center at 100 Mosher Road would be too far west to remedy the service gap, and that even with a 150-foot tall facility, distance and topography would prevent a facility there from providing reliable in-building service to many areas of the service gap, including the commercial area, Central Corinth School, and residential areas to the east of Main Street. There was also no evidence that this site would be available or would be any more likely to be approved than the proposed facility.

36. AT&T's December 1, 2020 submission demonstrated that a facility at the Village of Corinth Volunteer Fire Department, 16 Saratoga Street, would not be an acceptable alternate site because it would also be too far west to remedy the service gap, and that even with a 150-foot tall facility, distance and topography would prevent a facility there from providing reliable in-building service to many areas of the service gap, including portions of the commercial area, Central Corinth School, and residential areas to the east of Main Street. There was also no evidence that this site would be available or would be any more likely to be approved by the Village of Corinth than the proposed facility would be by the Town. In particular, the Fire Department site is in close proximity to homes and lacks the foliage buffer provided by the dense mature trees that would surround the proposed facility.

37. Finally, AT&T's December 1, 2020 submission demonstrated that a facility at the third alternate site, 10 Butler Drive, would be too far east to remedy the service gap, and that even with a 150-foot tall facility, distance and topography would prevent a facility there from providing reliable in-building service to many areas of the service gap, including portions of the commercial area and residential areas to the west of Main Street. There was also no evidence that this site would be available or would be any more likely to be approved than the proposed facility.

38. Neither the Zoning Board nor the Planning Board requested any information in response to Professor Johnson's report in addition to that provided by AT&T in its December 1, 2020 submission.

39. On December 7, 2020, the Zoning Board held its fourth meeting on the use variance application for the proposed facility and, based on the application materials, including AT&T's December 1, 2020 submission, approved the use variance by a 3-0 vote.

40. Approval of the use variance reflected recognition of the need for the facility at that location and that the height of the proposed facility was the minimum required to address the service gap.

41. On December 17, 2020, after AT&T extended the Shot Clock for a second time to accommodate the Planning Board's schedule, the Planning Board finally held a meeting to address the merits of the site plan application. Instead of acting, however, the Planning Board instead deferred action and scheduled a public hearing for January 6, 2021.

42. The January 6, 2021 public meeting was held on the day the third Shot Clock extension granted by AT&T would expire. The Planning Board voted unanimously to deny the site plan application, but did not at that time issue a writing memorializing the denial.

43. On January 14, 2021, the Planning Board issued its written decision denying the site plan application for the proposed facility, a true copy of which is submitted as Exhibit A to this Complaint. The written decision stated that the denial was "based on evidence and testimony presented to us, including 29 letters from neighborhood residents stating their concerns regarding the impact of the tower on their property values and the visual impact of the tower on their quality of life." It also cited the letters from "5 area real estate agents attesting to the negative impact of the proposed tower on property values and a petition with the names of 239 people speaking out in opposition to the location of the proposed tower in a residential area."

44. The January 14, 2021 decision also cited as a reason for denial of the site plan application that "the applicant has not satisfactorily established that the proposed tower is a minimally intrusive means to fill the gap in cell phone coverage."

45. Although the January 14, 2021 decision stated that "applicant provided an analysis of three other locations to demonstrate that coverage from those locations would not cover all of the gaps covered by the proposed site," it also cited as a reason for denial that AT&T "did not provide an analysis of the coverage possible by multiple towers located at less intrusive locations."

**Count I**

46.     AT&T incorporates the paragraphs set forth above as if set forth at length herein.

47.     47 U.S.C. § 332(c)(7)(B)(iii) requires that "any decision by a State or local government or instrumentality thereof to deny a request to place, construct or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

48.     Under New York law, a provider of personal wireless services seeking approval of a proposed facility is entitled to the same zoning preference enjoyed by public utilities, and need only establish that there is a service gap, that the location of the proposed facility will remedy that service gap, and that the needs of the broader public, on balance, would be served by granting approval of the proposed facility.

49.     The written record of the proceedings before the Planning Board establishes the existence of the service gap in the area to be served by the proposed facility, that the proposed facility would remedy that service gap, and that the needs of the broader public, on balance, would be served by granting approval of the proposed facility.

50.     Unsubstantiated personal opinions expressing generalized individual concerns about aesthetic and visual impacts on the neighborhood are not substantial evidence.

51. Letters of real estate brokers expressing an opinion on impact on property values without any supporting appraisal analysis are also not substantial evidence.

52. Proof that the proposed tower is minimally intrusive is not required to satisfy New York's public utility standard for approval of a personal wireless services facility.

53. The record does not contain substantial evidence supporting the Planning Board's denial of the site plan application for the proposed facility.

## Count II

54. AT&T incorporates the paragraphs set forth above as if set forth at length herein.

55. 47 U.S.C. § 332(c)(7)(B)(i)(II) and 47 U.S.C. § 253(a) prohibit denial of a request for approval of a facility where denial of that request would prohibit or have the effect of prohibiting the provision of covered services.

56. In *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment, Declaratory Ruling and Third Report and Order*, WT Docket No. 1779, WC Docket No. 17-84, FCC-18-133 (September 27, 2018) (the "FCC-18-133 Declaratory Ruling"), the FCC, pursuant to legislative authority, definitively interpreted 47 U.S.C. § 332(c)(7)(B)(i)(II) and 47 U.S.C. § 253(a) to provide that "an effective prohibition occurs where a state or local legal requirement materially inhibits a provider's ability to engage in any of a variety

of activities related to its provision of a covered service. This test is met not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving service capabilities."

57. The Planning Board denial of the site plan application materially inhibits AT&T's activities related to its provision of covered services.

58. The denial of the application for site plan approval also materially inhibits AT&T's ability to provide covered services, because without the proposed facility, a substantial number of AT&T customers in the significant area intended to be served by the proposed facility are unable to consistently and reliably access covered services. In addition, the ability of first responders to access FirstNet services is compromised.

59. AT&T made a good faith effort to identify and evaluate less intrusive alternatives, and the proposed facility is the least intrusive means of providing consistent and reliable in-building access to AT&T customers and FirstNet emergency responder users in the area intended to be served.

60. Under 47 U.S.C. § 332(c)(7)(B)(i)(II) and 47 U.S.C. § 253(a), Defendants' actions have the effect of prohibiting the provision of covered services in the area intended to be served.

## Count III

61. AT&T incorporates the paragraphs set forth above as if set forth at length herein.

62. Under 47 U.S.C. § 332(c)(7)(B)(ii), the TCA requires zoning, land use and other state or local permitting decisions relating to personal wireless services facility siting requests to be rendered within a reasonable period of time.

63. For an application for a new stand-alone facility, the presumed reasonable period of time to render such a decision is within 150 days after submission of the application for that facility. 47 C.F.R. §1.6003(c)(1)(iv).

64. The Planning Board unreasonably delayed its decision on the site plan application by deferring its review of the application for site plan approval for six months after it granted a SEQRA negative declaration, as pending review of an application by one board does not justify another board's failure to act within the presumptively reasonable time specified in 47 C.F.R. §1.6003(c)(1)(iv).

65. The Planning Board has further unreasonably delayed approval of the proposed facility by denying the application for site plan approval due to its claimed desire for an analysis of the coverage possible by multiple towers located at less intrusive locations. Despite the opportunity to make such a request under 47 CFR § 1.6003(d), and having the site plan application pending before it for ten months, the Planning Board did not raise the issue of an analysis of service from multiple towers before the meeting at which it denied the site plan application, and at no time did the Planning Board specify where any of those multiple towers might be located, nor did it define what factors it believes would make multiple facilities less intrusive.

66. The Planning Board failed to produce a written decision adopted by the Board prior to expiration of the extension of the Shot Clock.

67. Defendants failed to meet their duty under 47 U.S.C. § 332(c)(7)(B)(ii) to render zoning, land use and other state or local permitting decisions relating to wireless services facility siting requests within a reasonable period of time.

### Count IV

68. AT&T incorporates the paragraphs set forth above as if set forth at length herein.

69. The proposed facility application complied with all applicable requirements of the Town Land Use Law and New York law.

70. The Planning Board acted in an arbitrary and capricious manner in denying the site plan application due to the absence of information it had failed to request of AT&T despite abundant opportunity to do so.

71. The denial of the site plan application for the proposed facility by the Planning Board is arbitrary, capricious, unreasonable, and an abuse of discretion in violation of State law including but not limited to CPLR Article 78.

**WHEREFORE**, plaintiff AT&T requests judgment against the Defendants as follows:

    A.    Expedited disposition of this action pursuant to 47 U.S.C. § 332(c)(7)(B)(v);

    B.    Reversal of the denial of the site plan application for violation of 47 U.S.C. § 332(c)(7)(B)(iii);

    C.    Reversal of the denial of the site plan application for violation of 47 U.S.C. § 332(c)(7)(B)(i) (II) and 47 U.S.C. § 253(a);

    D.    Reversal of the denial of the site plan application for violation of 47 U.S.C. § 332(c)(7)(B)(ii);

E. Reversal of the denial of the site plan application for violation of CPLR Article 78;

F. Entry of an Order directing Defendants to immediately grant all variances, permits and approvals necessary to allow construction and operation of the proposed facility; and

G. Such other relief as this Court may deem equitable and just.

Dated: February 5, 2021        Respectfully submitted,

By: */s/ Helen E. Tuttle*
Helen E. Tuttle
FAEGRE DRINKER BIDDLE & REATH LLP
187 Wolf Rd., Suite 211
Albany, NY  12205
Tel.: (518) 452-8787
Fax: (518) 452 8767
Helen.Tuttle@faegredrinker.com